## Nos. 2015-1391, -1393, -1394

# In the
# United States Court of Appeals
## for the Federal Circuit

BLUE CALYPSO, LLC.,

*Appellant,*

v.

GROUPON, INC.,

*Cross-Appellant.*

———————————————————

Appeal from the United States Patent and Trademark Office,
Patent Trial and Appeal Board in Nos. CBM2013-00033 and CBM2013-00034.

## BRIEF OF CROSS-APPELLANT

JEANNE M. GILLS
JASON J. KEENER
AARON J. WEINZIERL
FOLEY & LARDNER LLP
321 North Clark Street
Suite 2800
Chicago, Illinois 60654-5313
(312) 832-4500

*Attorneys for Cross-Appellant
Groupon, Inc.*

Dated: June 8, 2015





FORM 9.  Certificate of Interest

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Blue Calypso, LLC _____ v. Groupon, Inc. _____

No. 15-1391-1393-1394

# CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)

Cross-appellant _____ certifies the following (use "None" if applicable; use extra sheets if necessary):

1.      The full name of every party or amicus represented by me is:

Groupon, Inc.

_____

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

Groupon, Inc.

_____

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

None

_____

4.  ☐   The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Foley & Lardner, LLP; Jeanne M. Gills, Jason J. Keener, Aaron J. Weinzierl, Troy D. Smith

_____

June 8, 2015 _____          /s/ Jeanne M. Gills _____
            Date                              Signature of counsel

                                         Jeanne M. Gills _____
                                              Printed name of counsel

Please Note: All questions must be answered

cc: _____

124

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ................................................................. i

TABLE OF CONTENTS .......................................................................... ii

TABLE OF AUTHORITIES ......................................................................v

I. STATEMENT OF RELATED CASES ........................................1

II. STATEMENT OF JURISDICTION ...........................................2

III. STATEMENT OF THE ISSUES ................................................2

IV. STATEMENT OF THE CASE ....................................................3

    A. Invalidity Grounds Raised In '679 And '670 CBM Proceedings .........4

    B. Summary Of '679 and '670 CBM Proceedings ...............................5

V. STATEMENT OF THE FACTS ..................................................8

    A. The '679 And '670 Patents....................................................8

    B. A Person Of Ordinary Skill In The Art .............................12

    C. The Prior Art ...................................................................13

        1. Paul....................................................................14

        2. Ratsimor .............................................................16

            (i) Overview...................................................16

            (ii) Public Accessibility Of The Ratsimor Report ...............18

VI. SUMMARY OF THE ARGUMENT ..........................................19

    A. Jurisdiction .......................................................................20

    B. Anticipation By Paul ........................................................20

    C. Ratsimor Anticipates Or Renders Obvious All Challenged Claims..........................................................................21

VII.   ARGUMENT .................................................................................21

A.    Standard Of Review ............................................................21

B.    The '679 and '670 Patents Are "Covered Business Method
      Patents" And The Board Thus Had Jurisdiction To Render Its
      Decisions ...........................................................................22

      1.    The USPTO Did Not Exceed Its Rule-Making Authority
            In Defining "Covered Business Method Patents" ...................22

      2.    The '679 and '670 Patents Are "Covered Business
            Method Patents" .......................................................23

      3.    The '679 and '670 Patents Are Not Technological
            Inventions ...............................................................25

C.    Substantial Evidence Supports The Board's Determination That
      Claims 7-16 And 23-27 Of The '679 Patent And Claims 1-5 Of
      the '670 Patent Are Anticipated By Paul ............................................29

      1.    The Four-Corners Of Paul Disclose Every Element Of
            Claims 7-16 And 23-27 Of The '679 Patent And Claims
            1-5 of the '670 Patent ...............................................29

      2.    Dr. Joshi And The Board Confirm A POSA Would Read
            Paul As Disclosing A Single System, Not Multiple
            Independent Embodiments ...........................................29

            (i)    The Plain Language Of Paul Discloses A Single
                   System ...........................................................30

            (ii)   Expert Testimony From Dr. Joshi And Dr. Rhyne
                   Confirms That A POSA Would Interpret Paul As
                   Disclosing A Single, Anticipatory, System ...................33

      3.    Blue Calypso's Arguments About Inherency Are
            Misplaced ...............................................................35

D.    The Board's Determination Regarding The Ratsimor Report
      Should Be Reversed, As The Ratsimor Report—Either Alone,
      Or In Combination—Renders Claims 1-6 And 17-22 Of The
      '679 Patent Unpatentable And Provides Independent Grounds

To Affirm The Unpatentability Of All Claims Of The '679 And '670 Patents ........................................................................36

1.     The Board Erred In Determining That The Ratsimor Reference Was Not Prior Art....................................................36

2.     The Board's Decision Is Not Supported By Substantial Evidence...................................................................................37

3.     The Board's Requirements For Internet Evidence Violate Public Policy ..............................................................................42

4.     Ratsimor Alone, Or In Combination With Paul, Renders Claims 1-6 And 17-22 Of The '679 Patent And Claims 1-5 Of the '670 Patent Unpatentable............................................43

      (i)     Ratsimor Anticipates Claims 1-16 and 23-27 of the '679 Patent And Claims 1-5 of the '670 Patent..............44

      (ii)     Ratsimor In Combination With Paul Renders Claims 1-27 Of The '679 Patent And Claims 1-5 Of The '670 Patent Unpatentable As Obvious ..............49

5.     Ratsimor Alone, Or In Combination With Paul Provides An Independent Ground On Which The Board's Decisions May Be Affirmed ....................................................50

VIII.   CONCLUSION.............................................................51

# TABLE OF AUTHORITIES

**Cases**                                                                     **Page(s)**

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
   134 S. Ct. 2347 (2014) ...................................................................................27

*In re Baxter Int'l, Inc.*,
   678 F.3d 1357 (Fed. Cir. 2012) ..............................................................21, 29

*Bettcher Industries, Inc. v. Bunzl USA, Inc.*,
   661 F.3d 629 (Fed. Cir. 2011) ................................................................29, 35

*Bruckelmyer v. Ground Heaters, Inc.*,
   445 F. 3d 1374 (Fed. Cir. 2006) ....................................................................36

*Consolidated Edison Co. v. Nat'l Labor Relations Bd.*,
   305 U.S. 197 (1938) .......................................................................................21

*Cornell Univ. v. Hewlett-Packard Co.*,
   No. 01-CV-1974, 2008 U.S. Dist. LEXIS 39343 (N.D.N.Y. May
   14, 2008) ..................................................................................................40, 42

*CSR, PLC v. Skullcandy, Inc.*,
   594 Fed. App'x 672 (Fed. Cir. 2014) .............................................................34

*In re Cuozzo Speed Techs.*,
   778 F.3d 1271 (Fed. Cir. 2012) .....................................................................26

*In re Gleave*,
   560 F.3d 1331 (Fed. Cir. 2009) ................................................................21, 22

*Kennametal, Inc. v. Ingersoll Cutting Tool Co.*,
   780 F.3d 1376 (Fed. Cir. 2015) ................................................................33, 34

*In re Klopfenstein*,
   380 F. 3d 1345 (Fed. Cir. 2004) ..............................................................21, 36

*Kroy IP Holdings, LLC v. Safeway, Inc.*,
   --- F. Supp. ---, No. 12-0800, 2015 U.S. Dist. LEXIS 69363 (E.D.
   Tex. May 29, 2015) ........................................................................................27

*KSR Int'l Co. v. Teleflex Inc.*,
  550 U.S. 398 (2007)..............................................................................22, 44, 49

*McCrary v. Elations Co., LLC*,
  No. 13-cv-242, 2014 U.S. Dist. LEXIS 8443 (C.D. Cal. Jan. 13,
  2014) ........................................................................................................13, 39

*Net MoneyIN, Inc. v. Verisign, Inc.*,
  545 F.3d 1359 (Fed. Cir. 2008) .........................................................................34

*Rexnord Indus., LLC v. Kappos*,
  705 F.3d 1347 (Fed. Cir. 2013) ...................................................................49, 51

*SRI Int'l, Inc. v. Internet Security Sys., Inc.*,
  511 F.3d 1186 (Fed. Cir. 2008) ............................................................37, 39, 43

*Trintec Industries, Inc. v. Top-U.S.A. Corp.*,
  295 F.3d 1292 (Fed. Cir. 2002) .........................................................................35

*Ultramercial, Inc. v. Hulu, LLC*,
  772 F.3d 709 (Fed. Cir. 2014) ...........................................................................27

*Voter Verified, Inc. v. Premier Election Sol'ns, Inc.*,
  698 F.3d 1374 (Fed. Cir. 2012) .........................................................................37

*In re Wyer*,
  655 F.2d 221 (CCPA 1981) ...............................................................................37

**Statutes / Acts**

28 U.S.C. § 1295(a)(4)(A) .....................................................................................2

35 U.S.C. § 141(c) .................................................................................................2

35 U.S.C. § 328(a) .................................................................................................2

35 U.S.C. § 329 ......................................................................................................2

America Invents Act, Pub. L. 112-29, 125 Stat. 284 ......................................*passim*

**Other Authorities**

37 C.F.R. § 42.73 ...................................................................................................2

37 C.F.R. § 42.301 ...................................................................................23, 26

157 Cong. Rec. 55,432 ..........................................................................24

157 Cong. Rec. S5428..........................................................................26, 27

77 Fed. Reg. 48,734 *et. seq.* ...............................................................24

Fed. R. Evid. 201 .................................................................................13

*J.P. Morgan Chase & Co. v. Intellectual Ventures II, LLC*,
    CBM2014-00160, Paper 11 (PTAB Jan. 29, 2015)...........................25

*Roxane Labs, Inc. v. Jazz Pharms, Inc.*,
    CBM2014-00161 Paper 16 (PTAB Feb 9, 2015) ..............................25

*Salesforce.com, Inc. v. Applications in Internet Time, LLC*,
    CBM2014-00168, Paper 10 (PTAB Feb. 2, 2015)............................25

*Sega of America, Inc. v. Uniloc USA, Inc.*,
    CBM2014-00183, Paper 11 (March 10, 2015).................................25

## I.    STATEMENT OF RELATED CASES

This consolidated cross-appeal and companion appeals are part of and related to consolidated appeals from Final Written Decisions of the Patent Trial and Appeal Board ("PTAB" or "the Board") of the United States Patent and Trademark Office ("USPTO") in the following cases involving Appellant, Blue Calypso, LLC[1] ("Blue Calypso") and Cross-Appellant, Groupon, Inc. ("Groupon"):

| | | |
|---|---|---|
| **CBM2013-00033** | **Appeal No.** | **15-1391 – Appeal by Blue Calypso** |
| | | **15-1393 – Cross-Appeal by Groupon** |
| **CBM2013-00034** | **Appeal No.** | **15-1394 – Appeal by Blue Calypso** |
| CBM2013-00035 | Appeal No. | 15-1399 – Appeal by Blue Calypso |
| | | 15-1401 – Cross-Appeal by Groupon |
| CBM2013-00044 | Appeal No. | 15-1396 – Appeal[2] by Groupon |
| CBM2013-00046 | Appeal No. | 15-1397 – Appeal by Blue Calypso |
| | | 15-1398 – Cross-Appeal by Groupon |

Appeal Nos. 15-1391, 15-1393, and 15-1394 have been consolidated.  All of the above-referenced appeals have been designated as companion cases.

These appeals are also related to pending district court litigation instituted by Blue Calypso, Inc. involving allegations of patent infringement of claims of the patents at issue in these appeals:  *Blue Calypso, Inc. v. Groupon, Inc.*, No. 6:12-cv-

---

[1] Blue Calypso, LLC is identified as the real party in interest in the PTAB proceedings.  However, the related district court litigation was originally filed by Blue Calypso, Inc. on July 31, 2012.  Blue Calypso, LLC was only recently added as a co-plaintiff on April 22, 2015.

[2] Blue Calypso's appeal, No. 15-1395, was dismissed by this Court's Order dated May 1, 2015, and the Parties realigned by that same Order.

486 (E.D. Tex.) (lead case); *Blue Calypso, Inc. v. IZEA, Inc.*, No. 6:12-cv-786

(E.D. Tex.); *Blue Calypso, Inc. v. Yelp, Inc.*, No. 6:12-cv-788 (E.D. Tex.); and

*Blue Calypso, Inc. v. FourSquare Labs, Inc.*, No. 6:12-cv-837 (E.D. Tex.).

This appeal is also related to a prior appeal before this Court regarding a writ

of mandamus on Groupon's Motion to Transfer:  *In re Groupon, Inc.*, which was

decided by Judges Lourie, Dyk, and Reyna on April 23, 2014, No. 2014-118.  562

F. App'x 976 (Fed. Cir. 2014) (opinion by Judge Lourie).

## II.     STATEMENT OF JURISDICTION

This Court has jurisdiction pursuant to 28 U.S.C. § 1295(a)(4)(A); 35 U.S.C.

§ 329 and 35 U.S.C. § 141(c).  The PTAB entered Final Written Decisions

pursuant to 35 U.S.C. § 328(a) and 37 C.F.R. § 42.73 on December 17, 2014.

Groupon timely filed a notice of appeal on February 4, 2015.  (JA854-57).

## III.     STATEMENT OF THE ISSUES

1.     Whether substantial evidence supports the Board's holdings that U.S.

Patent Nos. 8,155,679 (the "'679 Patent") and 8,457,670 (the "'670 Patent") are

"covered business method patents" subject to review pursuant to Section 18 of the

America Invents Act, Pub. L. 112-29, 125 Stat. 284 ("AIA").

2.     Whether substantial evidence supports the Board's holding that the

prior art reference "Paul" anticipates claims 7-16 and 23-27 of the '679 Patent and

claims 1-5 of the '670 Patent.

3.      Whether the Board erred in holding that the prior art reference "Ratsimor" is not prior art to the '679 and '670 Patents and therefore that: (1) Ratsimor—either alone or in view of Paul—does not render all challenged claims 1-27 of the '679 Patent unpatentable; and (2) Ratsimor—either alone or in view of Paul—does not likewise render all challenged claims 1-5 of the '670 Patent unpatentable, which would in turn provide an independent basis to affirm the unpatentability of those claims.

## IV.   STATEMENT OF THE CASE

This appeal and cross-appeal arise out of the Final Written Decisions of the PTAB finding claims 7-16 and 23-27 of the '679 Patent unpatentable, claims 1-5 of the '670 Patent unpatentable, and claims 1-6 and 17-22 of the '679 Patent  not unpatentable.  Blue Calypso is appealing the Board's invalidity finding with respect to claims 7-16 and 23-27 of the '679 Patent and claims 1-5 of the '670 Patent.  Groupon is appealing the Board's finding with respect to the Ratsimor reference which led to, *inter alia*, claims 1-6 and 17-22 of the '679 Patent being found not unpatentable.

In 2012 and by amended complaints in 2013 and 2015, Blue Calypso sued Groupon for infringement of U.S. Patent Nos. 7,664,516; 8,155,679; 8,457,670; 8,452,646; and 8,438,055.  Within one year of the assertion of the '679 and '670 Patents, Groupon timely filed a Petition for Covered Business Method Patent

3

Review ("CBM") of those patents.  Groupon also timely filed CBM petitions for

the remaining asserted patents within one year of assertion of those patents.

## A.    Invalidity Grounds Raised In '679 And '670 CBM Proceedings

The following grounds of unpatentability formed the basis of Groupon's

CBM Petition with respect to the '679 Patent:

Ground 1:    Claims 1-16 and 23-27 are unpatentable as anticipated by
Ratsimor under 35 U.S.C. § 102(b);

Ground 2:    Claims 1-16 and 23-27 are unpatentable as anticipated by Paul
under 35 U.S.C. § 102(b);

Ground 3:    Claims 1-27 are unpatentable as obvious based on Ratsimor in
view of Paul under 35 U.S.C. § 103; and

Ground 4:    Claims 1-27 are unpatentable as obvious based on Ratsimor in
view of McLean under 35 U.S.C. § 103.

The following grounds of unpatentability formed the basis of Groupon's

CBM Petition with respect to the '670 Patent:

Ground 1:    Claims 1-5 are unpatentable as anticipated by Ratsimor under
35 U.S.C. § 102(b);

Ground 2:    Claims 1-5 are unpatentable as anticipated by Paul under 35
U.S.C. § 102(b);

Ground 3:    Claims 1-5 are unpatentable as obvious based on Ratsimor in
view of Paul under 35 U.S.C. § 103; and

Ground 4:    Claims 1-5 are unpatentable as obvious based on Ratsimor in
McLean under 35 U.S.C. § 103.

Groupon relied on two principal prior art references that disclosed methods

and systems for targeted advertising and providing incentives prior to the '679 and

4

'670 Patents: U.S. Patent Publication No. 2002/0169835 to Glen Hale Paul Jr., *et al.* ("Paul") published November 14, 2002 (JA989-1022; JA6094-6127); and Olga Ratsimor *et al.*, Technical Report TR-CS-03-27 "Intelligent Ad Hoc Marketing Within Hotspot Networks," published in November 2003 ("Ratsimor" or "the Ratsimor Report") (JA972-988; JA6094-6127). Groupon also relied on one secondary reference that also disclosed methods and systems for targeted advertising prior to the priority dates of the '679 and '670 Patents: U.S. Patent Publication No. 2007/0207780 to Ivan Hugh McLean ("McLean") published September 6, 2007. (JA1698-1715; JA6796-6813).

### B. Summary Of '679 and '670 CBM Proceedings

Rejecting Blue Calypso's arguments that the '679 and '670 Patents are not covered business method patents; that Ratsimor is not prior art; and that Ratsimor and Paul failed to disclose certain limitations, the Board instituted trial on the following grounds with respect to the '679 Patent (JA459):

Ground 1: Claims 1-16 and 23-27 of the '679 Patent are unpatentable as anticipated by Ratsimor under 35 U.S.C. § 102(b);

Ground 2: Claims 1-16 and 23-27 of the '679 Patent are unpatentable as anticipated by Paul under 35 U.S.C. § 102(b); and

Ground 3: Claims 1-27 of the '679 Patent are unpatentable as obvious based on Ratsimor in view of Paul under 35 U.S.C. § 103.

Similarly, the Board instituted trial on the following grounds with respect to the '670 Patent (JA5604):

5

Ground 1:    Claims 1-5 of the '670 Patent are unpatentable as anticipated by Ratsimor under 35 U.S.C. § 102(b);

Ground 2:    Claims 1-5 of the '670 Patent are unpatentable as anticipated by Paul under 35 U.S.C. § 102(b); and

Ground 3:    Claims 1-5 of the '670 Patent are unpatentable as obvious based on Ratsimor in view of Paul under 35 U.S.C. § 103.

The Board declined to institute trial in the '679 CBM proceeding on the additional ground of obviousness based on Ratsimor in view of McLean, finding that ground redundant to those on which review was instituted.  (JA458; JA5603).

In both proceedings, Groupon and Blue Calypso each submitted expert testimony.  Groupon provided the expert testimony of Dr. Anapum Joshi, Oros Family Professor in the Department of Computer Science and Electrical Engineering at the University of Maryland, Baltimore County ("UMBC") with over 20 years of experience in the computer science and electrical engineering field, co-author of more than 175 papers in this area, an expert in the field of intelligent networked systems, and having a wide range of experience in the areas of mobile computing, semantic web, social computing, and data/web mining. (JA1023-24, JA5067; JA6128-29, JA10115-16).  Blue Calypso offered the testimony of Dr. Vernon Rhyne, who has a Ph.D. in Electrical Engineering with experience in computer technology and microcontrollers.  (JA4769-770; JA9862-63).  Unlike Dr. Joshi, Dr. Rhyne does not have any work, academic, or consulting experience in mobile commerce or peer-to-peer networks outside of his work as a

litigation consultant.  (JA1787-1794; JA6882-89).  Following depositions of the

parties' experts and an oral hearing, the Board determined claims 7-16 and 23-27

of the '679 Patent and claims 1-5 of the '670 Patent are unpatentable.  (JA43;

JA90).

*First*, with respect to Paul, the Board found claims 7-16 and 23-27 of the

'679 Patent and claims 1-5 of the '670 Patent were anticipated by Paul because

Paul "discloses an Internet-based e-mail communications system that sends

personalized e-mail messages to members . . . [that] includes an advertisement for

a particular business, and a hyperlink to a web site of a business."  (JA32; JA76).

"[T]he member sends the e-mail message (with the embedded hyperlink and

associated referral communication data packed, which identifies the business

sponsoring the advertising campaign) to one or more friends."  (JA32-33; JA77).

*Second*, with respect to Ratsimor, the Board found that claims 1-6 and 17-22

of the '679 Patent and claims 1-5 of the '670 Patent were not unpatentable based

on its determination that Ratsimor was not shown to be prior art because there was

no evidence that Ratsimor "was downloaded or otherwise disseminated, or how

persons interested and ordinarily skilled in the subject matter or art, exercising

reasonable diligence, could locate the Ratsimor [Report]."  However, among other

evidence establishing public availability of the Ratsimor Report (JA972-988;

JA6077-6093), the record included a prior article on the same subject matter

7

("Ratsimor Article," JA2219-2226; JA7314-7321) that was undisputedly published and downloaded over 4000 times—by the same primary author, Olga Ratsimor. (JA4757-58; JA9852-53). The Board nonetheless disagreed with Groupon that the Ratsimor Article would have easily led an interested researcher to the Ratsimor Report. (JA26-29; JA70-74). Accordingly, the Board determined that claims 1-6 and 17-22 of the '679 Patent and claims 1-5 of the '670 Patent were not shown to be unpatentable as either anticipated by Ratsimor or rendered obvious over Ratsimor in view of Paul. (JA30-31; JA74-75).

## V.    STATEMENT OF THE FACTS

### A.    The '679 And '670 Patents

The '679 and '670 Patents are both directed to a method and system for incentivizing a person to refer targeted advertisements to others. The '670 Patent claims to be a continuation of the '679 Patent which issued from Application No. 12/592,019 (the "'019 Application (filed on November 18, 2009), and which attempts to claim priority to U.S. Patent Application No. 11/318,144 (the "'144 Application") (filed December 23, 2005) and U.S. Provisional Application No. 60/639,267 (the "'267 Provisional") (filed December 27, 2004). Claims 1-22 of the '679 Patent and each of the claims of the '670 Patent require providing an "endorsement tag" or sending a "token." (JA109-110; JA128). During prosecution of the '144 Application, claims 1 and 2 were completely rewritten and

in a Request for Continuing Examination ("RCE") filed August 3, 2009, Blue

Calypso *first* introduced the terms "endorsement tag" and "token."  Those terms do

not exist anywhere in the specification of the '144 Application.  The term

"endorsement tag" was first added in the specification of the Blue Calypso patents

in the '019 Application.  (JA3548; JA8680).

The problem the '679 and '670 Patents seek to solve is a business one.

Indeed, the applicants described the problem as "need exists for a method that

offers more frequent and effective direct advertising to peer-to-peer users."

(JA103 at col. 1, ll. 36-40; JA122).  The inventors claimed there was "declining

ability to offer advertisements through traditional broadcast advertising media."

(JA103 at col. 1, ll. 36-37; JA122).  As a purported solution, the '679 and '670

Patents describe a method for advertisers to target ads to users based on

demographic profiles of the users and then incentivize those users through the use

of a subsidy to refer those ads to other individuals using general well-known

computer components.   (JA103 at col. 2, ll. 38-41; JA122) ("the intermediary

communication subsidy program 13 may be developed using an object-oriented

programming language such as Java$^{TM}$ or C++, C#, or other programming

language"); (JA103 at col. 2, ll. 26-28; JA122) ("communication devices include

cellular phone, personal digital assistants (PDA), personal computers. . . .");

(JA103 at col. 2, ll. 42-45; JA122) (communication transmission may be "a cellular

9

phone call, a video conferencing session, an instant message . . .”); (JA103 at col. 2, ll. 56-62; JA122) (“network 6 may be the Internet, a private network, a cellular phone network, or other service provider networks . . .”).  Six core concepts are common to the claims of the ’679 and ’670 Patents: (1) creating profiles for the advertiser and subscribers, including a set of demographic data; (2) deriving a match condition between the two profiles; (3) determining if the subscriber is a qualified subscriber; (4) use of an “endorsement tag” or “token” when referring the advertisement; (5) transmitting the advertisement upon execution of the “endorsement tag;” and (6) providing the subscriber a subsidy for the referral. (JA1030; JA6135).

# Claims – '679



1. In a system comprising a network, a source communi-
60 cation device, a destination communication device and an
intermediary connected to the network, said intermediary
comprising a server adapted to execute a method for provid-
ing advertising content from at least one advertiser of a group
of advertisers to a recipient associated with the destination
65 communication device and for subsidizing a qualified sub-
scriber associated with the source communication device
comprising:

obtaining a first profile from the at least one advertiser in
the group of advertisers including a set of demographic
requirements related to at least one advertiser of a group
of advertisers and storing the first profile by the inter-
mediary;                                                    5

obtaining a second profile from the source communication
device including a set of demographic data related to a
subscriber and storing the second profile by the interme-
diary;

deriving a match condition between the first profile and the   10
second profile;

determining if the subscriber is a qualified subscriber based
on the match condition;

conditioning a set of subsidy programs based on the match   15
condition;

communicating a subsidy program of the set of subsidy
programs to the qualified subscriber;

receiving one or more selections of the at least one adver-
tiser of the group of advertisers and of the chosen sub-   20
sidy program from the set of subsidy programs;

providing an endorsement tag related to the at least one
advertiser of the group of advertisers and linked with the
advertising content;

transmitting to the qualified subscriber information for   25
creating a content communication that can be sent from
the qualified subscriber to the recipient, the content com-
munication including the endorsement tag;

subsidizing the qualified subscriber according to the cho-
sen subsidy program;                                       30

receiving a signal through execution of the endorsement
tag to transmit the advertising content; and,

transmitting the advertising content to the recipient.

**Profile**

**Match**

**Qualified Subscriber**

**Endorsement Tag/Token**

**Subsidy**

**Advertising Content**

---

(12) **United States Patent**    (10) Patent N
Levi et al.                      (45) Date of

(54) **SYSTEM AND METHOD FOR PEER-TO PEER**        7,664,516 B2 *
**ADVERTISING BETWEEN MOBILE**              2001/0047294 A1
**COMMUNICATION DEVICES**                   2002/0071076 A1
                                            2002/0077988 A1*
                                            2002/0091589 A1
(75) Inventors: **Andrew E. Levi**, Plano, TX (US);   2002/0094868 A1
                **Bradley W. Bauer**, Richardson, TX  2002/0160761 A1
                (US)                                  2002/0198777 A1
                                            2003/0144035 A1
(73) Assignee: **Blue Calypso, LLC**, Carrollton, TX  2003/0177347 A1
                (US)

( * ) Notice:   Subject to any disclaimer, the term of this     FOREIG
                patent is extended or adjusted under 35    JP      2001/256
                U.S.C. 154(b) by 366 days.



(JA2242; *see* JA7336).  The additional features described in the dependent claims of both patents are minor extensions of these key concepts.  (JA1030, JA1081-86; JA6135; JA6179-84).  Upon issuance, both patents' classifications included Class 705 for data processing: financial, business practice, management, or cost/price determination.  (JA92, JA111; JA1276-1304, JA6374-6402).

**B.  A Person Of Ordinary Skill In The Art**

As Dr. Joshi testified, a person of skill in the art ("POSA") in this area would be facile with computers and the Internet:

> [A POSA] would have had a Bachelor-level degree in
> computer science or a related discipline, with a
> background in peer-to-peer networks or mobile
> commerce. This description is approximate, and a higher
> level of education or skill might make up for less
> experience, and vice-versa.

(JA1025; JA6130).  Dr. Rhyne's definition of a POSA similarly included a person

with at least a Bachelor level degree in computer science or related field who

would have been facile with the Internet.  (JA4781-82; JA9873-75).  Accordingly,

a POSA operating in this area would be familiar with both the Internet and Internet

search engines, and would certainly know how to search the Internet.  By 2003, the

Internet and Internet search engines were pervasive.  (JA1330; JA6428)

("Currently [January 2003], the primary repository of both dynamic and static

information is the Internet.  One can access CNN's website and obtain news, stock

quotes and weather information.  One can also issue queries in Google to search

and obtain, say, a clip art image from the WWW.").[3]

### C.    The Prior Art

Prior to the earliest effective filing date of the '679 and '670 Patents,

methods and systems for matching advertisers and retailers to customers and

providing incentives for referring such advertisements to others were well known.

---

[3] This is also a fact the Court may take judicial notice of.  Fed. R. Evid. 201;
*McCrary v. Elations Co., LLC*, No. 13-cv-242, 2014 U.S. Dist. LEXIS 8443, at *3
& n. 3 (C.D. Cal. Jan. 13, 2014).

(JA1027; JA6132).  The idea of providing profile based incentives was well known along with providing targeted advertising, including using profiles in peer-to-peer networks (JA1305-1697; JA6403-6795).  The prior art disclosed the use of mobile devices and networks, mobile commerce, peer-to-peer networks, the use of profiles to select content and information to be shared, the use of profiles and demographic information for targeting users, the recommendations for services to users in peer-to-peer mobile commerce environments, the matching of user profiles against advertisements to target customers, and the tailoring of user experiences on mobile devices based on user contexts.  (JA1026-28; JA6131-33).  The specification of the '144 Application also speaks to prior art techniques.  (JA859; JA5964).  The concept of targeted advertisements based on demographics was thus well known to a POSA, (JA1026-28; JA6131-33), as exemplified by the Paul and Ratsimor references.

### 1.    Paul

Paul teaches a system for the referral of targeted advertisements in an Internet-based email marketing system.  Paul discloses an advertising network consisting of a number of advertisers and members.  (JA1003-04 ¶ 33; JA6108-09).  Advertisers can send direct marketing to portions of the membership through various profile matching of advertiser and member profiles based on demographics.  (JA1000-01 ¶ 10, JA1006¶ 51, JA1008 Table 7.2, JA1009 ¶ 66,

JA1010 Table 7.3, JA1011 ¶ 75;  JA6105-06, JA6111, JA6113, JA6114, JA6115, JA6116).  This targeting of members is controlled by the Campaign Manager.  (JA1004 ¶ 34, JA1006 ¶¶ 50, 51, JA1008 Table 7.2; JA6109, JA6111, JA6113).

In addition to a standard advertising campaign, the Campaign Manager can be used to run a Refer-A-Friend campaign that rewards members if they successfully refer non-members to that particular advertiser.  (JA1016  ¶¶ 101-02; JA6121).  The referral email is created by the Refer-A-Friend routine and the referral campaign is run by the Campaign Manager.  (JA1106 ¶ 50; JA6111).  The members who receive the referral email can forward the email to non-members.  The referral email includes a hyperlink to allow the non-members to sign up for the advertising network, including ads for the advertiser running the referral campaign.  The email further includes an ID to identify the member who made the referral.  If the non-member is successfully referred, the member who did the referring is compensated by additional discounts, a lottery, or some other subsidy.  (JA1016; JA6121 ¶¶ 100 and 101).

As Dr. Joshi testified, a POSA would understand that Paul's features can be used together, especially where components of Paul (*e.g.*, "refer-a-friend") are called "routines" that a POSA would expect to be "called" or executed by other elements of the overall system.  (JA1760-61; JA6857).  In addition, Paul explicitly discloses the combination of functions.  (JA1016; JA6121) ("The random drawing

function can be linked to the refer a friend email campaign such that members, who are successful in having their friends 'click on' the embedded hyperlink text and have an indicator in their member records reflecting the receipts of a referral communications data packet, are rewarded by being placed in a limited pool of potential random drawing participants.").

### 2.    Ratsimor

#### (i)    Overview

Ratsimor is a Technical Report authored by Olga Ratsimor, Sethuram Balaji Kodeswaran, Tim Finin, Anapum Joshi and Yelena Yesha, all members of UMBC's Department of Computer Science and Engineering.  The report number, TR-CS-03-27, means this was the 27th report in 2003 in the Computer Science Department.  (JA1024; JA6129).

The authors were working on a framework, "eNcentive," designed for providing incentives such as subsidies in a peer-to-peer mobile environment by trying to match user needs to that of providers of advertisements and subsidies. (JA6080; JA975).  Ratsimor's eNcentive system identifies advertisements of interest between an advertiser and a user based on the matching of "profiles" that can be broad (*e.g.*, coffee drinkers) or narrow (*e.g.*, neighborhood coffee shops) as desired.  (JA975, JA976, JA978, JA981, JA983; JA6080, JA6081, JA6083, JA6086, JA6088).  Ratsimor teaches that this profile matching can occur either at

16

the user device (a push system) or at the intermediary (a pull system).  (JA984; JA6089).

After a user receives the targeted advertisements, he then broadcasts those ads to other eNcentive users he passes that have profiles also interested in those advertisements.  (JA979, JA981; JA6084, JA6086).  Ratsimor teaches that this broadcasting of advertisements can either be automated, selective (choosing targeted instead of general ads to share), or specific (choosing whether or not to share an advertisement with a replication policy).  (JA1739-1742; JA6837-6840).  Once received, the user gets a snapshot of basic information about the advertisement but can press a "view" hyperlink to link back to a webserver running at the business to download additional information about the ad.  (JA986, JA1744; JA6091, JA6843).  Each time the ad is passed along, a UserID is attached to the lightweight data structure such that when a user redeems a coupon they are provided with additional discounts if any ads they previously passed along were redeemed.  (JA174, JA443-45, JA986; JA5594-95, JA6091, JA6843).

The Ratsimor Report was not the first publication of the authors' work on the eNcentive framework.  In October 2003, Ratsimor, Finin, Joshi, and Yesha authored a paper in the International Conference on Electronic Commerce entitled *eNcentive: A Framework for Intelligent Marketing in Mobile Peer-To-Peer Environments*.  (JA2219-2226; JA7314-7321,"Ratsimor Article").  That paper

17

alone was accessed at least 4,486 times, showing public interest and awareness of this work.  (JA4757; JA9852).

### (ii)    Public Accessibility Of The Ratsimor Report

Dr. Joshi, an author, provided unrebutted testimony that the Ratsimor Report was publicly available for viewing and downloading on the Internet from the UMBC website in November 2003.  (JA1024; JA6129).  Blue Calypso declined to depose Dr. Joshi on this testimony.  (JA767; JA5880).  In addition to publication on the UMBC website, there is substantial evidence that the Ratsimor Report was publicly accessible prior to the filing of the '679 and 670 Patents:

- Olga Ratsimor's "Publication" page on the UMBC website provides a link to the Ratsimor Report.  (JA972; JA6077).

- Dr. Rhyne, Blue Calypso's expert, relies on a 1996 article from UMBC that directs authors of Technical Reports to make them accessible on the Internet.  (JA4751-56; JA9846-9851 "Sherman Article").

- The metadata for the .pdf of the Ratsimor Report shows that the file was created in June 2003.  (JA2105-06; JA7200-01).

- Olga Ratsimor's resume, cover letter, and UMBC webpage for eNcentive all identify the Ratsimor with a November 2003 publication.  (JA2107-2113; JA7202-08).

- Ratsimor is cited as a November 2003 publication in three U.S. Patents.  (JA2115; JA2168, JA2194; JA7210, JA7263, JA7289).

- Metadata associated with the webserver currently hosting Ratsimor and the Ratsimor file indicates the file has been present on that server at least since October 24, 2004.  (JA2142; JA7237).

Blue Calypso made no challenge to the admissibility of Olga Ratsimor's "Publications" website, the metadata for the Ratsimor Report, or the metadata associated with the webserver currently hosing the Ratsimor Report. (JA669-676; JA5780-87). Blue Calypso also offered into evidence the Sherman Article, Exhibit 2036, and a UMBC webpage regarding the eNcentive project, Ex. 2037, which indicated the Ratsimor Article was downloaded over 4000 times. (JA4757-58; JA9852-53). Dr. Rhyne, Blue Calypso's expert also testified that if someone wanted to disseminate a technical report (as recommended by the Sherman Article), it would have been even more likely they would post it on the Internet in 2003 than in 1996 (the date of the Sherman Article). (JA1888-89; JA6983-84).

## VI.    SUMMARY OF THE ARGUMENT

The Board's decision should be affirmed with respect to invalidity of claims 7-16 and 23-27 of the '679 Patent and claims 1-5 of the '670 Patent. The Board had jurisdiction over these  patents and properly determined that Paul anticipates claims 7-16 and 23-27 of the '679 Patent and claims 1-5 of the '670 Patent. The Board erred, however, in holding that the Ratsimor Report is not prior art to the '679 and '670 Patents and that claims 1-6 and 17-22 of the '679 Patent are not unpatentable on the basis of Ratsimor alone or in combination with Paul.

19

## A.    Jurisdiction

The Board correctly determined, and substantial evidence supports its determination, that the '679 and '670  Patents are "covered business method patents" subject to review pursuant to Section 18 of the AIA.  The patents are classified in a financial related class (705), and all of the claims require "subsidizing" or providing a "subsidy," which the Board construed as "financial assistance given by one to another" and which Blue Calypso does not appeal. (JA8, JA53, JA109; JA128).  The '679 and '670 Patent claims recite general computer steps and thus fall far short of the legal requirements of a technological invention.  *See supra* at 9-13.  Blue Calypso's arguments to the contrary would effectively eliminate covered business method patent review of any patent and vitiate Section 18 of the AIA.

## B.    Anticipation By Paul

The Board correctly determined, and substantial evidence supports its determination, that Paul anticipates claims 7-16 and 23-27 of the '679 Patent and claims 1-5 of the '670 Patent.  Blue Calypso concedes that every limitation of these claims is contained within the four-corners of Paul.  Blue Calypso's argument that Paul discloses two distinct systems that cannot be combined is contrary to law, Paul's express disclosures, and credible expert testimony regarding how a POSA would interpret Paul.

### C.    Ratsimor Anticipates Or Renders Obvious All Challenged Claims

The Board erred in holding that the Ratsimor Report is not prior art to the
'679 and '670 Patents given the substantial evidence of record that demonstrates its
public accessibility and a POSA's ability to locate it.  Reversal of the Board on this
publication issue not only renders claims 1-6 and 17-22 of the '679 Patent
unpatentable, but also supports unpatentability of claims 1-27 of the '679 Patent
and claims 1-5 of the '670 Patent.  The Ratsimor Report thereby provides an
independent basis to affirm the Board's invalidity decision.

## VII.  ARGUMENT

### A.    Standard Of Review

The Board's legal conclusions are reviewed *de novo* and its factual findings
are reviewed for substantial evidence.  *In re Baxter Int'l, Inc.*, 678 F.3d 1357, 1361
(Fed. Cir. 2012).  Substantial evidence is that quantum of evidence that a
reasonable mind might accept as adequately supporting the conclusion for which it
is proffered.  *See Consolidated Edison Co. v. Nat'l Labor Relations Bd.*, 305 U.S.
197, 229 (1938).  What a reference discloses is question of fact that is reviewed for
substantial evidence.  *See Baxter*, 678 F.3d at 1361.  Additionally, whether a
reference qualifies as a printed publication is also a question of fact.  *In re
Klopfenstein*, 380 F. 3d 1345, 1350 (Fed. Cir. 2004).  Anticipation is a question of
fact, which is reviewed for substantial evidence.  *In re Gleave*, 560 F.3d 1331,

1334-35 (Fed. Cir. 2009).  The ultimate determination of obviousness under 35

U.S.C. § 103 is a question of law based on underlying factual inquires.  *KSR Int'l*

*Co. v. Teleflex Inc*., 550 U.S. 398, 427 (2007).

### B.    The '679 and '670 Patents Are "Covered Business Method Patents" And The Board Thus Had Jurisdiction To Render Its Decisions

The Board's determinations that the '679 and '670 Patents are "covered

business method patents" are supported by the patents themselves and the statute.

The AIA created a post-grant review process for patents that are a "covered

business method patent"—"a patent that claims a method or corresponding

apparatus for performing data processing or other operations used in the practice,

administration, or management of a financial product or service, except that the

term does not include patents for technological inventions."  AIA § 18(d)(1).  All

of the claims at issue require "subsidizing" or providing a "subsidy," which the

Board construed as "financial assistance given by one to another."  (JA109; JA8;

JA128; JA53).  Blue Calypso does not appeal the Board's construction of

"subsidy" as "financial assistance given by one to another," thereby rendering the

'679 and '670 Patents squarely within the AIA's definition.  (JA15).

### 1.    The USPTO Did Not Exceed Its Rule-Making Authority In Defining "Covered Business Method Patents"

Contrary to Blue Calypso's implied argument (Appellant's Br. at 20-23), the

USPTO did not exceed its rule-making authority.  The USPTO followed the

statutory text word-for-word in rule-making and Blue Calypso cites no case that a statutory definition was improper. *See* AIA § 18(d)(1); 37 C.F.R. § 42.301(a).

### 2.    The '679 and '670 Patents Are "Covered Business Method Patents"

The '679 and '670 Patents solve a business problem, not a technological one. As the applicants described the problem, there was "declining ability to offer advertisements through traditional broadcast advertising media." (JA103 col. 1, ll. 36-37; JA122). According to the inventors, "this invention provides and advertising system that offer frequent and effective advertising." (JA103 col. 1, ll. 39-40; JA122).

Each challenged claim requires a subsidy (or "financial assistance") be provided to the subscriber. (JA8, JA53, JA109, JA128). The Board construed subsidy as "financial assistance given by one to another," which Blue Calypso does not appeal. (JA8; JA53). Additionally, the '679 and '670 Patents are directed to a business problem and in fact are classified in class 705 for data processing: financial, business practice, management, or cost/price determination. (JA1276; JA6374). Thus, the '679 and '670 Patents are patents that claim a method for performing data processing or other operations used in the practice, administration, or management of a financial product or service.

Blue Calypso's argument that Covered Business Method Patent Review is limited to "products or services that are particular to or characteristic of financial

institutions" is contrary to the express language of the Act and the legislative history of the AIA.  The AIA definition includes claims to methods or corresponding apparatuses "***used in the practice, administration, or management*** of a financial product or service."  AIA § 18(d)(1) (emphasis added).  It is not limited to financial institutions.  Further, as Senator Schumer noted, "[t]he plain meaning of 'financial product or service' demonstrates that section 18 is not limited to the financial services industry."  157 Cong. Rec. 55,432 (daily ed. Sept. 8, 2011) (statement of Sen. Schumer).  The legislative history further indicates that a patent need not explicitly claim a financial product or service, but instead if a claimed "marketing method could be applied to marketing a financial product or service, the patent would be deemed to cover a 'financial product or service.'"  *Id*. at 51,364-65.[4]

---

[4] Blue Calypso's reliance on Representative Schuster's comments and proposed legislation in the Patent Quality Improvement Act of 2013, S. 866, 113th Cong. (2013) that would expand the definition of covered business method patent is misplaced.  Representative Schuster's comments have been criticized as a self-serving attempt to rewrite through legislative history a definition Representative Schuster previously offered and which Congress rejected.  157 Cong. Rec. 55,432 (daily ed. Sept. 8, 2011) (statement of Sen. Schumer).  Additionally, the USPTO adopted its rules for Covered Business Method Patent Reviews on August 14, 2012.  77 Fed. Reg. 48,734-48,753.  A bill that would ***expand*** the scope of the statute after adoption of those rules, without more, does not suggest Congress thought the USPTO had exceeded its authority or construed "covered business method patent" in a way that reached beyond that which the AIA permitted.

Further, and contrary to Blue Calypso's argument, the standard the USPTO applies does not "capture[ ] any patent relating to commerce."  In fact, the Board has expressly rejected such a standard.  *Roxane Labs, Inc. v. Jazz Pharms, Inc.*, CBM2014-00161, Paper 16 at 17 (PTAB Feb. 9, 2015).  Additionally, the Board has denied multiple CBM petitions for patents relating to commerce finding the patents fail to meet the statutory CBM definition.  *Id*. at 14-21; *Salesforce.com, Inc. v. Applications in Internet Time, LLC*, CBM2014-00168, Paper 10 at 8, 10 (PTAB Feb. 2, 2015) (denying institution of a CBM proceeding for a patent disclosing applicability to "banking, financial and securities activities and foreign trade" for not satisfying the "covered business method patent" definition); *J.P. Morgan Chase & Co. v. Intellectual Ventures II, LLC*, CBM2014-00160, Paper 11 at 11 (PTAB Jan. 29, 2015); *Sega of America, Inc. v. Uniloc USA, Inc*., CBM2014-00183, Paper 11 at 3, 13 (PTAB March 10, 2015).

### 3. The '679 and '670 Patents Are Not Technological Inventions

Blue Calypso does not contest that the '679 and '670 Patents are not technological inventions under the USPTO's rules.[5]  Instead, Blue Calypso argues

---

[5] The USPTO's decision that the '679 and '670 Patents are not patents directed to a technological invention is also supported by the record.  Blue Calypso does not—and cannot—argue that the  network, source communication device, destination communication device, intermediary, software, or software-based executable hyperlinks in its claims are novel in and of themselves.  Blue Calypso itself admits these are generic elements.  *See supra* at 9-13.

the USPTO's definition, adopted pursuant to the rulemaking authority granted to the USPTO as part of the AIA, is unduly narrow.  However, Blue Calypso does not address the legal standards for determining whether an agency exceeded its authority and cites no case in support of its argument that the USPTO's definition should be set aside.  Blue Calypso's argument that the USPTO's rules for determining whether a patent is for a technological invention should be set aside are thus waived.

Notwithstanding waiver, the USPTO's definition of "technological invention" is proper.  Because Congress explicitly designated rulemaking authority to the USPTO in Section 18 of the AIA, the USPTO's definition must be affirmed so long as it "is based on a permissible construction of the statutory language at issue."  *See* AIA §18 (d)(2) ("To assist in implementing the transitional proceeding authorized by this subsection, the Director shall issue regulations for determining whether a patent is for a technological invention."); *In re Cuozzo Speed Techs.*, 778 F.3d 1271, 1282 (Fed. Cir. 2012).  Here, the USPTO's definition of "technological invention" is a permissible construction of the statutory language.

The PTAB considers "whether the claimed subject matter as a whole recites a technological feature that is novel and unobvious over the prior art; and solves a technical problem using a technical solution."  37 C.F.R. § 42.301.  This rule follows from and is consistent with the legislative history.  *See* 157 Cong. Rec.

S5428 (statement of Sen. Coburn) ("Patents for technological inventions are those

patents whose novelty turns on a technological innovation over the prior art and are

concerned with a technical problem which is solved with a technical solution.").

This is also consistent with the Supreme Court's and this Court's Section 101

authorities.  In *Alice*, the Supreme Court considered whether the claimed invention

"improved an existing technological process," "improved the functioning of the

computer itself," or "effect[ed] an improvement in any other technology or

technical field."  *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2358-59

(2014).  In *Ultramercial, Inc. v. Hulu, LLC*, this Court considered whether each of

the individual limitations required something more than "routine, conventional

activit[ies]."  772 F.3d 709, 716 (Fed. Cir. 2014).  While these decisions addressed

the second-prong of the *Alice* test for determining patent eligibility, that prong

considers whether a claimed method, purportedly novel, is sufficiently tied to

patent-eligible subject matter: processes, machines, manufacture, or compositions

of matter.  *See Ultramercial*, 772 F.3d at 721 ("In effect, *Alice* articulated a

technological art test for patent eligibility") (J. Mayer, concurring).[6]

---

[6] *See also Kroy IP Holdings, LLC v. Safeway, Inc.*, --- F. Supp. ---, No. 12-0800, 2015 U.S. Dist. LEXIS 69363, at *5, 77 (E.D. Tex. May 29, 2015) (J. Bryson sitting by designation) (holding that a patent directed to providing incentive awards to consumers involving a "host computer," "provider," "sponsor," and "database of awards" failed the second prong ("technological invention") of the *Alice* test).

Blue Calypso's alternative definition of "technological invention" as an invention "relating to or involving technology, especially scientific technology" is unnecessary and improper. The USPTO's rule that inquires "whether the claim recites *a technological feature* that is novel and unobvious" does not swallow the exception as it does not inquire whether the claim as a whole is novel and unobvious. Further, Blue Calypso's definition is so expansive, the exclusion of "technological inventions" from "covered business method patents" in Section 18(d)(1) would preclude covered business method patent review of virtually any patent. Every patent can be said to relate to or involve technology. *See* 35 U.S.C. § 101 (permitting patents only for inventions of a "new and useful process, machine, manufacture, or composition of matter").

Blue Calypso's arguments simply lack merit and, this Court should find, as did the Board, that the '679 and '670 Patents are covered business method patents and is not technological inventions.

### C.    Substantial Evidence Supports The Board's Determination That Claims 7-16 And 23-27 Of The '679 Patent And Claims 1-5 Of the '670 Patent Are Anticipated By Paul

#### 1.    The Four-Corners Of Paul Disclose Every Element Of Claims 7-16 And 23-27 Of The '679 Patent And Claims 1-5 Of the '670 Patent

On appeal, Blue Calypso concedes that the four-corners of Paul disclose every limitation of claims 7-16 and 23-27 of the '679 Patent and claims 1-5 of the '670 Patent.  (Appellant's Br. at 27-33).  Blue Calypso's only challenge to the Board's holding of invalidity is that Paul discloses two "separate and mutually exclusive methods," and accordingly cannot anticipate the claims of the '679 and '670 Patents.  (*Id.*)  Blue Calypso is wrong and its arguments misconstrue Paul and the Board's decision.

#### 2.    Dr. Joshi And The Board Confirm A POSA Would Read Paul As Disclosing A Single System, Not Multiple Independent Embodiments

What a prior art reference discloses must be considered in view of one of ordinary skill in the art.  *Bettcher Industries, Inc. v. Bunzl USA, Inc.*, 661 F.3d 629, 641 (Fed. Cir. 2011).  The Board's determination of what Paul discloses is a question of fact that is reviewed for substantial evidence.  *See Baxter*, 678 F.3d at 1361.  Here, substantial evidence—the Paul reference itself and corroborating expert testimony as to how Paul would be interpreted by a POSA—supports the Board's conclusion.  Paul describes a "single system."  (JA1000; JA6105).  That

system includes computer routines that a POSA skilled in computer programming would understand could be used separately or together.  Blue Calypso's expert, Dr. Rhyne, admits the targeting and matching of advertisements based on demographics in the "advertising method" is controlled by Paul's Campaign Manager.  (JA1953-55; JA7048-50).  Paul teaches that the Refer-a-Friend routine is a tool within the Campaign Manager that requires the Campaign Manager to run the campaign and to send the email.  (JA5387-91; JA10435-39).  Paul's Campaign Manager is also expressly taught as having the ability to target its campaigns based on member demographics (JA1006, JA1011; JA6111, JA6116).  Dr. Joshi's testimony—credited by the Board—also supports these conclusions.  (JA37-39, JA81-83).

### (i)     The Plain Language Of Paul Discloses A Single System

Paul's Background, Objectives, and Summary sections all describe a single system.  (JA1000-01; JA6105-06).  As Paul states, Figure 5 "diagrammatically illustrates the campaign manager for the communications system."  (JA1006; JA6111).



FIG. 5

(JA994; JA6099).

Additionally, Paul teaches that the Refer-a-Friend routine is a tool within the Campaign Manager that requires the Campaign Manager to run the campaign and to send the email. (JA5387-5391; JA10435-39). Further, the Campaign Manager is expressly taught as having the ability to target its campaigns based on member demographics. (JA1006, JA1011; JA6111, JA6116).

Blue Calypso's argument that Paul discloses two mutually exclusive methods relies wrongly on a misreading (and misrepresentation) of Paul's disclosures. Blue Calypso states that Paul's Campaign Manager is one function that is independent of the refer a friend campaign tool. (Appellant's Br. at 31).

The Campaign Manager is *not*, as Blue Calypso argues, element 108 from Figure 5 alone, but rather the entire system.  The item designated 108 is the "campaign routine."  (JA1007; JA6112).  As Paul states: "Sponsors can add new news items, with graphics, web links or hyperlinks, and have the ability to create numerous types of e-mail campaigns, such as 'refer a friend' campaign, through the campaign manager program discussed later."  (JA1006, JA1761-62; JA6111, JA6858-59).

Moreover, Paul expressly discloses that in setting up a campaign, the refer-a-friend function is available as a tool:

> [0086]  If the user at SP1 selects tools from Primary Function Table 6.1, the web-based communications system at central server **12** provide the following functions in Table 13.0. Other functions may be provided to users.

| Functions Available as Tools 13.0 |
| --- |
| Conduct a random drawing |
| Create a link for a banner ad |
| Create a refer-a-friend (recruit new member) campaign |
| Add a news item for member club |
| Add a new hyperlink to other web sites |
| Edit the member club web pages |
| Web development tool-page editor |

(JA1013; JA6118); (JA38; JA82) (PTAB Judge Kim noting that under Blue Calypso's logic "in Microsoft Word, if I create a document and I save it later, but there are two different routines, I would not know to create a document and save it.").  As the Board held, the campaigns and refer a friend routines are tool options to be used together "without *any* need for picking, choosing, and combining

various disclosures not directly related to each other by the teachings of the cited reference." (JA39-40; JA84).

> **(ii)    Expert Testimony From Dr. Joshi And Dr. Rhyne Confirms That A POSA Would Interpret Paul As Disclosing A Single, Anticipatory, System**

As Groupon's expert, Dr. Joshi testified, "Paul discloses one overall system that includes both targeted advertising emails along with incentivizing users to send referral emails to other recipients." (JA1760-61; JA6857-58). Contrary to Blue Calypso's argument, "a [POSA] would not assume that Paul is describing two completely distinct, mutually incompatible systems." (JA1761-62; JA6858-59). Instead, Paul explicitly states that the referral email can be created through use of the Campaign Manager. (JA1761-62; JA6858-59). Dr. Rhyne also admits the targeting and matching of advertisements based on demographics in the "advertising method" is controlled by Paul's Campaign Manager. (JA1953-1955; JA7048-7050).

Further, if a POSA, reading a reference with disclosures of different components or examples would "at once envisage the claimed arrangement," the reference is anticipatory. *Kennametal, Inc. v. Ingersoll Cutting Tool Co.*, 780 F.3d 1376, 1381 (Fed. Cir. 2015). In *Kennametal*, the Court held that a prior art reference that disclosed five potential metals to use in a binder and multiple coating techniques anticipated a claim directed to a specific coating even though

there was no disclosure that the particular combination had been made.  *Id.* at

1383.  The Court noted:

> At the very least, Grab's [the prior art's] express
> "contemplation" of PVD coatings is sufficient evidence
> that a reasonable mind could find that a person of skill in
> the art, reading Grab's claim 5, would immediately
> envisage applying a PVD coating.  Grab col.4 l.59.  Thus,
> substantial evidence supports the Board's conclusion that
> Grab effectively teaches 15 combinations, of which one
> anticipates pending claim 1.

*Id.*  Here, Dr. Joshi's testimony and the express disclosures of Paul demonstrate, as

in *Kennametal, Inc.*, that a POSA reading Paul would "'at once envisage' the

claimed arrangement" of the '679 and '670 Patents.  *See id.* at 1381; *see also CSR,*

*PLC v. Skullcandy, Inc.*, 594 Fed. App'x  672, 679-680 (Fed. Cir. 2014) (finding

substantial evidence supported the PTAB's finding of anticipation based upon the

combination of two figures noting "each figure is an example . . . not isolated

embodiments of the invention").

Thus, this case is unlike *Net MoneyIN, Inc. v. Verisign, Inc.*, 545 F.3d 1359

(Fed. Cir. 2008).  In *Net MoneyIN*, two separate systems were disclosed, neither

disclosing all of the claim elements, including a protocol for processing internet

credit card transactions using five links, nor was there any indication that the two

systems worked together or could be combined.  *Id.* at 1371.  Instead, each of the

disclosed protocols was separate.  *Id.*  Here, and unlike in *Net MoneyIN*, Paul

discloses a single system in which the "Refer-a-Friend" routine is part of the

Campaign Manager, and where undisputedly all claim elements are disclosed in Paul. Additionally, a POSA would envision the arrangement of a targeted campaign including the additional "Refer-a-Friend" feature. (JA1760-63; JA6857-6860).

### 3. Blue Calypso's Arguments About Inherency Are Misplaced

Blue Calypso's arguments about inherency are irrelevant. The Board did not analyze Paul in terms of inherency and the word "inherent" does not appear in the Board's decision. The Board properly looked to how a POSA would interpret Paul which is the exact question Blue Calypso's authority directs the Board to answer. *See Bettcher Industries*, 661 F.3d at 641 (finding no error in a jury instruction that prior art must be understood "as viewed by one of ordinary skill in the art"). The portions of *Bettcher Industries* and *Trintec Industries, Inc. v. Top-U.S.A. Corp.*, 295 F.3d 1292 (Fed. Cir. 2002), relating to inherency are thus entirely inapposite and do not serve as a basis for reversal.

Substantial evidence supports the Board's conclusion that Paul anticipates claims 7-16 and 23-27 of the '679 Patent and claims 1-5 of the '670 Patent and the Board's decisions should be affirmed.

**D.    The Board's Determination Regarding The Ratsimor Report Should Be Reversed, As The Ratsimor Report—Either Alone, Or In Combination—Renders Claims 1-6 And 17-22 Of The '679 Patent Unpatentable And Provides Independent Grounds To Affirm The Unpatentability Of All Claims Of The '679 And '670 Patents**

### 1.    The Board Erred In Determining That The Ratsimor Reference Was Not Prior Art

The Board erred in its finding that the Ratsimor Report was not a printed publication under 35 U.S.C. § 102(b).  While the Board correctly recognized some evidence of Ratsimor's public accessibility, it ignored substantial evidence (much of it unchallenged by Blue Calypso) and held Groupon to a standard for proving public accessibility of an Internet report that would violate public policy.  Reversal of the Board's decision with respect to Ratsimor would result in claims 1-6 and 17-22 of the '679 Patent unpatentable and would be a basis for affirming the unpatentability of all challenged claims.

Whether a reference qualifies as a printed publication "involves a case-by-case inquiry into the facts and circumstances surrounding the reference's disclosure to members of the public." *In re Klopfenstein*, 380 F.3d at 1350.  A reference is "'publicly accessible' upon a satisfactory showing that such document has been disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art exercising reasonable diligence, can locate it. . . ." *Bruckelmyer v. Ground Heaters, Inc.*, 445 F.3d 1374,

36

1378 (Fed. Cir. 2006).  The intent to publicize is a factor that supports public accessibility.  *In re Wyer*, 655 F.2d 221, 227 (CCPA 1981).  Additionally, indexing and actual retrieval of a publication are not prerequisites to a finding of public accessibility.  *Voter Verified, Inc. v. Premier Election Sol'ns, Inc.*, 698 F.3d 1374, 1380 (Fed. Cir. 2012); *SRI Int'l, Inc. v. Internet Security Sys., Inc.* 511 F.3d 1186, 1197 (Fed. Cir. 2008).

### 2.    The Board's Decision Is Not Supported By Substantial Evidence

The Board's determination that Ratsimor was not prior art is not supported by substantial evidence and must be reversed.  Dr. Joshi, provided unrebutted testimony that the Ratsimor Report was publicly available for viewing and downloading on the Internet from the UMBC website in November 2003 and Blue Calypso declined to depose Dr. Joshi on this point despite the Board's express direction to Blue Calypso to do so.  (JA443; JA5593).  Both Dr. Joshi and Dr. Rhyne also provided consistent testimony on a POSA's background—a person who certainly would have been facile with the Internet and able to use search engines to find reports of interest.  (JA1025; JA4781, JA6130-31, JA9873-74).  By 1996, well before the effective filing date of the '679 and '670 Patents, as Blue Calypso's expert, Dr. Rhyne, himself points out, UMBC was instructing its students to make these exact Technical Reports available on the internet for others to find.  (JA4751-56, JA9846-51).  Dr. Rhyne further confirms that due to the

37

pervasiveness of the Internet these instructions had even more weight at the time of the publication of the Ratsimor Report (late 2003) than in 1996.

The evidence that Ratsimor herself followed UMBC's instructions and made the Ratsimor Report publicly available in November 2003 on the UMBC website is uncontradicted and includes:

- Dr. Joshi's unchallenged testimony.  (1024; JA6129).

- Olga Ratsimor's "Publication" website providing a link to the Ratsimor Report with a publication date of November 2003.  (JA872; JA6077).

- The metadata for the .pdf of the Ratsimor Report shows that the file was created in June 2003.  (JA2105; JA7200).

- Olga Ratsimor's resume, cover letter, and UMBC webpage for eNcentive list Ratsimor with a November 2003 publication.  (JA2107-13; JA7202-08).

- Metadata associated with the webserver currently hosting Ratsimor and the Ratsimor file indicates the file has been present on that server at least since October 24, 2004.  (JA2142; JA7237).

In addition to publication on the UMBC website, there is substantial evidence that the Ratsimor Report was disseminated and made available to a POSA exercising reasonable diligence.  The Ratsimor Report was indisputably

made publicly available on a major university's website to anyone who wanted to obtain it.  Information on the Internet is available to the public.  *See, e.g., McCrary*, 2014 U.S. Dist. LEXIS 8443, at *3 & n. 3 (taking judicial notice of the fact that internet articles are available to the public).  Other POSA have located the Ratsimor Report as reflected in the fact that it is cited as a November 2003 publication in three U.S. Patents, completely unrelated to the parties (JA2115, JA2168, JA2194; JA7210, JA7263, JA7289).  It would strain credulity that a third party patentee or the PTO would cite to the Ratsimor Report in another patent filing if the report itself had never been viewed or accessed.

Thus, despite the overwhelming evidence that Ratsimor was available to a POSA, the Board analogized the Ratsimor Report to a paper placed on an FTP server likely available only to those who knew it was there.  (JA27-29; JA71-72).  No evidence supports this analogy.  In *SRI Int'l, Inc.*, upon which the Board relied, the majority determined there was no evidence as to how someone would locate a paper placed on an unindexed FTP site without prior knowledge of the full directory path and filename; and evidence suggested an intent that the paper ***not*** be made public.  511 F.3d at 1197.  An FTP site requires knowledge of the FTP server name and the folder structure on the FTP server.  *See id.* at 1190-91, 1196.  Here, the Ratsimor Report was linked to Olga Ratsimor's "Publications" webpage, was intended to be publicly accessible, and was accessible.  (JA872; JA6077).  Further,

the Ratsimor Report is text searchable, located on a public University's website, and contains a "Keywords" section. (JA975; JA6080). There is no reason to believe that a search using Google, Yahoo, or other search engine (in widespread use by 2003 as reflected by the prior art Dr. Joshi testified was known to a POSA) would not have returned the Ratsimor Report. (JA4781-82; JA9873-75; JA1330; JA6438). This more than meets the preponderance of the evidence standard.

Moreover, regardless of the availability of the Ratsimor Report from an Internet search, a POSA would be led to the Ratsimor Report by relying on the "research aid" provided by the October 2003 Ratsimor Article published and presented at the International Conference on Electronic Commerce. *See Bruckelmyer*, 455 F.3d at 1379; *Cornell Univ. v. Hewlett-Packard Co.*, No. 01-CV-1974, 2008 U.S. Dist. LEXIS 39343, at *21-22 (N.D.N.Y. May 14, 2008) ("The question of whether a reference was 'meaningfully catalogued or indexed' falls to the side when a 'research aid' enables on of skill in the art to locate the sought-after reference."

It is undisputed that the October 2003 Ratsimor Article regarding precisely the same research project was publicly available. (JA28; JA72). That article, presented at the International Conference on Electronic Commerce, explicitly references additional work that the authors (all at UMBC) were working on and contemplating and was downloaded over 4400 times. (JA1041, JA2224-25,

JA4757-58; JA7314, JA7319-320, JA9852-53) (*e.g.*, "We are currently working on expanding functionalities [of] our framework. . . . We are currently exploring other *reward models* like aggregation of multiple businesses supporting each other by giving cross promotions") (emphasis in original). The high number of downloads alone demonstrates that the Ratsimor Article was well known to a POSA and that a POSA would have been specifically motivated to look for related work from the UMBC and from these authors in particular. Indeed, the October 2003 Ratsimor Article included the subject of the work, name of the project "eNcentive," author's' names, institution, department and geographic location. (JA1041; JA7314). Thus, a POSA in the art of electronic commerce would know to visit the UMBC website, and particularly Dr. Ratsimor's webpage thereon to see what additional work had been conducted and would be directed to the Ratsimor Technical Report through Olga Ratsimor's "Publications" page. (JA803).

Despite this, the Board rejected Ratsimor finding that the "October 2003 article does not point an interested researcher expressly to the Ratsimor paper on the Departmental webserver" and because there was "insufficient evidence . . . presented to establish the Department's webserver contained an index or catalog, or any other tools for finding the Ratsimor paper based on the subject matter of the paper." (JA28-29; JA73-74). No such legal requirements exist. "Express reference" is not necessary, and the Ratsimor Report is supported by better

evidence than the unpublished thesis in *Cornell*.   In *Cornell*, the thesis was found to be prior art because it was disclosed "in such a way as to make it accessible to any reader interested in the subject matter" not because there was an express reference.  *Cornell*, 2008 U.S. Dist. LEXIS 39343, at *12, 21 (finding "thesis title, author name, institution, department, and . . . geographic location" sufficient tools to locate the thesis).  In fact, a POSA would have to work harder to find the thesis of *Cornell* than the Ratsimor Report.  The *Cornell* thesis was in a non-public area of a single library and was indexed only by author and year.  *Id.* at *16.  Here, the Ratsimor Report was available on the Internet at UMBC and thus accessible worldwide by anyone with a computer; further, Olga Ratsimor's "Publication" webpage indicated her as the author and included the title and year of the Ratsimor Report.  (JA872; JA6077).

### 3.    The Board's Requirements For Internet Evidence Violate Public Policy

The Board's standard would impose a requirement on Petitioners seeking to institute review of patents to, without subpoena power, proffer a declaration from a search engine to attest to fact that a document published on the Internet in 2003 and made available without restriction to the entire world, was actually crawled, indexed, and searchable by that search engines' algorithm as of a date perhaps a decade prior to the petition.  Such an implicit requirement is not only contrary to law, but also violates public policy by creating an undue burden on litigants and

the Board. Indexing is not a prerequisite to a finding of public accessibility. *SRI Int'l*, 511 F.3d at 1197. It should instead suffice that at least by 2003, use of Internet was pervasive and that articles were certainly searchable, crawlable, and accessible from major universities like UMBC. This is particularly so given the number of times the related Ratsimor Article was accessed and the other evidence of record including testimony of a co-author that the article was publicly available. *See supra* at 18-19. The Board cannot ignore that a POSA here is a computer scientist with knowledge of mobile commerce, well versed in use of Internet and online research tools. The Board's determination that Ratsimor was not publicly available is not supported by substantial evidence and must be reversed.

### 4.    Ratsimor Alone, Or In Combination With Paul, Renders Claims 1-6 And 17-22 Of The '679 Patent And Claims 1-5 Of the '670 Patent Unpatentable

Reversal of the Board's decision regarding Ratsimor would lead to the correct finding of claims 1-6 and 17-22 of the '679 Patent as unpatentable. Likewise, it provides an independent basis to affirm the unpatentability of claims 1-5 of the '670 Patent.

Claims 17-22 add known elements or additional steps regarding "transmitting a message," "comparing the desired demographic profile," "recognizing a subsidy," or "providing a subsidy." (JA1082). As Dr. Joshi testified, these claim limitations are disclosed in the combination of Ratsimor and

Paul. (*Id.*).  Ratsimor discloses these additional steps, including that "current

marketing approaches use SMS (Short Message Service), MMS (Multimedia

Messaging Services) and EMS (Enhanced Messaging Services) messages sent by

merchants to the user's mobile phone." (JA316-319, JA976, JA1052).  As the

Board erred in finding that Ratsimor was not shown to be prior art, the Board

further erred in not holding claims 17-22 invalid as obvious over Ratsimor in view

of Paul.  None of Blue Calypso's arguments that claims 17-22 are patentable were

based on the limitations contained in dependent claims 17-22.  (JA578-587).

Accordingly, this Court can determine that claims 17-22 are invalid as obvious in

the first instance.  *KSR Int'l*, 550 U.S. at 420.  At a minimum, this Court should

remand the case to the Board for the Board to determine whether Ratsimor in

combination with Paul renders claims 17-22 unpatentable.

### (i)    Ratsimor Anticipates Claims 1-16 and 23-27 of the '679 Patent And Claims 1-5 of the '670 Patent

Ratsimor discloses each of the key concepts of the claims of the '679 and

'670 Patents and does so as those limitations are arranged in the claims.

### (a)    creating profiles for the advertiser and subscribers, including a set of demographic data

As Dr. Joshi testified, Ratsimor teaches creating profiles for users that

include features such as demographic data: "[t]he devices will consult with user's

profile before storing the promotions and advertisements." (JA1031; JA6136-37; *see also* JA976,  JA979, JA981; JA6081, JA6084, JA6086).

(b)    deriving a match condition between the two profiles

Ratsimor also teaches deriving a match condition between a merchant's desired profile and a user profile in the context of disseminating promotions and that the match may be a bi-lateral endorsement. (JA1032; JA6137-38). The Board noted that Ratsimor discloses a merchant selectively providing targeted promotions to customers headed to an area near the merchant's competitors. (JA444-45, JA980-81; JA5594-95, JA6085-86). Additionally, users in Ratsimor may select both an advertiser and a subsidy program. (JA980-82, JA1032, JA1035, JA1738-41, JA1753; JA6085-87, JA6137, JA6139-40, JA6836-840, JA6849, JA6853). Just as an advertiser can identify potential subscribers based on criteria (such as coffee drinkers), Ratsimor discloses a subscriber has numerous ways to decide whether to pass on an advertisement to another user. (JA981-82, JA1738-742, JA1749-750, JA1909-911; JA6086-87, JA6836-840, JA6849-450, JA7004-06). Even Dr. Rhyne conceded users select a subsidy program by selecting between generic and targeted promotions. (JA1912-15; JA7007-7010). Further, Dr. Rhyne admits that Ratsimor teaches that the intermediary can perform this matching function. (JA1867-68; JA6962-63; *see also* JA1751-52; JA6851-52).

> (c)    determining if the subscriber is a qualified
> subscriber

Ratsimor also teaches the concept of a qualified subscriber:  Only certain users (subscribers) whose profiles allow receiving certain advertisements will be qualified to receive the advertisement or promotions.  (JA1033; JA976, JA981).  Ratsimor further discloses that determining whether a subscriber is qualified can be done at an "intermediary" as  Ratsimor's system uses one or more computer servers and memory executing computer applications and communications.  (JA2158 at 3:24-26) (defining "intermediary"); (JA1047-48, JA978; JA6085, JA6149-150).  Further, even if comparison of profiles by the eNcentive software running on the user's device is not at an intermediary, Ratsimor discloses this determination being done at the intermediary.  Dr. Rhyne admits that Ratsimor discloses the ability for the intermediary to perform this function.  (JA1867-68; JA6962-63; *see also* JA1751-52, JA981; JA6851-52, JA6085).

> (d)    use of an "endorsement tag" or "token" when
> referring the advertisement

Ratsimor further discloses use of an "endorsement tag" or "token."  A POSA would understand the "View" link, displayed as an icon with an "Internet Explorer" window on a PDA as a hyperlink to the Internet and there is no other reasonable interpretation.  (JA1922-24, JA986, JA1743-44; JA7017-19, JA6091 JA6841-42).  Ratsimor's system uses PDAs with limited storage space, designed to

allow customers to ***choose to collect*** advertisements of interest to them, with an "option to receive" and not have them "forced like much hated popup advertisements." (JA977; JA6082; *see* JA1743-44; JA6841-43).

      (e)    transmitting the advertisement upon execution of the "endorsement tag"

Ratsimor further discloses transmitting the advertisement upon execution of the endorsement tag. (JA1036, JA1743-45; JA5111-13, JA5377-5380, JA6142, JA6843-44, JA10159-61, JA10425-28). Ratsimor further discloses that a signal to transmit the advertising content is received through execution of the endorsement tag. When the user of Ratsimor chooses to receive the advertisement and clicks on the "View" hyperlink (*see supra*), a signal is received to send the advertisement, which is later presented. (JA979, JA1036, JA1743, JA1744; JA6084, JA6141, JA6841-44).

      (f)    providing the subscriber a subsidy for the referral

Ratsimor teaches offering a variety of incentive or subsidy programs, such as discounts and rewards, including free access to the network. (JA1033-34, JA980; JA6138-39, JA6085) ("To reward Susan for her assistance, ***Jazz Café*** gives her 2% off in addition to the 10% off from the original e-promotion and 10 minutes of free internet access. . . ."). Additionally, and contrary to Blue Calypso's prior argument, Ratsimor discloses that the subsidy can be provided by the intermediary. (JA977; JA6082).

      (g)    Ratsimor discloses other limitations in the '679 and '670 Patents

Ratsimor also discloses the minor extensions of these key concepts that Blue Calypso argued Ratsimor does not disclose, including:

- "the recipient having a relationship to the subscriber"

Ratsimor further discloses the recipient and subscriber having a relationship. Blue Calypso does not define "relationship." Notwithstanding this, Ratsimor discloses the recipient and subscriber having a geographically close relationship in order to share the promotion. (JA977, JA979-80, JA1030-33; JA1746-48, JA6082, JA6084-85, JA6135-38, JA6845-47, JA6853). Another possible construction of "relationship", a device known or trusted to the system, is also disclosed by Ratsimor. (JA1747-48).

- "the method being executed by a processor"

Ratsimor further discloses that the method is executed by a processor. (JA1755; JA6850-52, JA9913, JA7253).

- "an intermediary, supporting . . . an analysis application . . . resident on a computer server" and a processor that is configured "to execute the analysis application," to "conduct an evaluation of the first set of data," to "determine an amount of the subsidy according to the Evaluation" and to "relate the subsidy to the qualified subscriber"

Ratsimor further teaches that the eNcentive system utilizes a server and that the system evaluates the eNcentive ID provided by the recipient in order to determine the appropriate amount of subsidy to provide the subscriber. (JA981-83, JA1047-

48

48, JA1051, JA1750-52, JA1757).  Further, Rhyne admits that while Ratsimor

discloses the user device comparing profiles for privacy reasons, it also teaches the

ability for the intermediary to perform these functions when additional safeguards

are used to offset privacy concerns.  (JA1867-68; JA6962-63;  *see also* JA1751-52,

JA981; JA6851-52, JA6085).

Ratsimor thus discloses each of the elements of claims 1-16 and 23-27 of the

'679 Patent and they are unpatentable as anticipated by Ratsimor.  *Kennametal,*

*Inc.*, 780 F.3d at 1381.  Additionally, Ratsimor discloses each of the elements of

claims 1-5 of the '670 Patent and thus provides an independent basis to affirm the

Board's determination of invalidity of those claims as they are also unpatentable as

anticipated by Ratsimor under 35 U.S.C. § 102(b).  *Rexnord Indus., LLC v.*

*Kappos*, 705 F.3d 1347, 1356 (Fed. Cir. 2013).

> **(ii)**     **Ratsimor In Combination With Paul Renders Claims 1-27 Of The '679 Patent And Claims 1-5 Of The '670 Patent Unpatentable As Obvious**

As Groupon urged below, Ratsimor in combination with Paul also renders

claims 1-27 of the '679 Patent and claims 1-5 of the '670 Patent unpatentable as

obvious.  *KSR Int'l*, 550 U.S. at 420.  Blue Calypso made no independent argument

below (*i.e.*, not raised with respect to the disclosures of Ratsimor and Paul) that the

combination of Ratsimor and Paul does not render claims 1-27 of the '679 Patent

or claims 1-5 of the '670 Patent obvious except that Ratsimor teaches away from

Paul. (JA578-587; JA5691-5699). Ratsimor does not, and a POSA would look to the combination of Ratsimor and Paul. (JA1770-72, JA631-633, JA309-310; JA6866-68, JA5483-84, JA5743-44). Both references are directed to peer-to-peer advertising systems, and both disclose well known techniques and teach advertising systems that provide incentives for passing advertisements to others. (JA975, JA1016, JA1079-1080, JA457; JA6080, JA6121, JA6178-79, JA5602). As Dr. Joshi testified, a POSA would be motivated to combine Ratsimor and Paul. (JA1771-72; JA1080; JA6867, JA6179).

Blue Calypso has not suggested or offered any evidence of any secondary considerations of non-obviousness. Thus, Ratsimor, in combination with Paul renders claims 1-27 of the '679 Patent and claims 1-5 of the '670 Patent invalid as obvious based on Ratsimor in view of Paul under 35 U.S.C. § 103.

At a minimum, the Board should remand the case to the Board for the Board to determine in the first instance whether Ratsimor, alone or in combination with Paul, renders claims 1-6 and 17-22 of the '679 Patent unpatentable.

> **5.    Ratsimor Alone, Or In Combination With Paul Provides An Independent Ground On Which The Board's Decisions May Be Affirmed**

Even if this Court finds the Board erred in holding claims 7-16 and 23-27 of the '679 Patent and claims 1-5 of the '670 Patent unpatentable as anticipated by Paul—the Board did not—this Court should nonetheless affirm the unpatentability

of those claims. *Rexnord Indus., LLC*, 705 F.3d 1at 1356 ("A successful party . . . may sustain its judgment on any ground that finds support in the record."). As shown above, Ratsimor alone anticipates claims 1-16 and 23-27 of the '679 Patent and claims 1-5 of the '670 Patent and in combination with Paul, renders claims 1-27 of the '679 Patent and claims 1-5 of the '670 Patent obvious. *Supra* at 44-49; (JA1737, 1753, JA1770; JA6835, JA6853, JA6865).

At a minimum, the Board should remand the case to the Board for the Board to determine in the first instance whether Ratsimor, alone or in combination with Paul, renders claims 1-6 and 17-22 of the '679 Patent unpatentable.

## VIII. CONCLUSION

For these reasons, this Court should: (1) affirm the Board's final written decision holding that claims 7-16 and 23-27 of the '679 Patent and claims 1-5 of the '670 Patent are unpatentable; and (2) reverse the Board's final written decision holding that claims 1-6 and 17-22 of the '679 Patent are not unpatentable.

Dated: June 8, 2015                    Respectfully submitted,


                                       */s/  Jeanne M. Gills*

                                       Jeanne M. Gills
                                       Jason J. Keener
                                       Aaron J. Weinzierl
                                       FOLEY & LARDNER LLP
                                       321 North Clark Street, Suite 2800
                                       Chicago, Illinois 60654-5313
                                       (312) 832-4500

                                       *Counsel for Cross-Appellant*
                                           *Groupon, Inc.*

4812-7873-8724.

**Form 19**

FORM 19.  Certificate of Compliance With Rule 32(a)

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.     This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) or Federal Rule of Appellate Procedure 28.1(e).

☑     The brief contains [ *10,467* ] words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), or

☐     The brief uses a monospaced typeface and contains [ _____ ] lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Rule of Appellate Procedure 28.1(e) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

☑     The brief has been prepared in a proportionally spaced typeface using [ *Microsoft Word 2010* ] in [ *Times New Roman 14pt.* ], or

☐     The brief has been prepared in a monospaced typeface using [ _____ ] with [ _____ ].

/s/ Jeanne M. Gills
_____
(Signature of Attorney)
Jeanne M. Gills
_____
(Name of Attorney)
Cross-Appellant
_____
(State whether representing appellant, appellee, etc.)
June 8, 2015
_____
(Date)

Reset Fields